AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
06/06/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: AP  DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
JUN - 6 2025
CENTRAL DISTRICT OF CALIFORNIA
EASTERN DIVISION  BY DEPUTY

| | |
|---|---|
| United States of America<br>v.<br>Joseph Randolph Thamas,<br><br>Defendant(s) | Case No. 5:25-mj-00410 |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of **June 4, 2025** in the county of **Riverside** in the **Central** District of **California**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. §§ 1324(a)(1)(A)(ii) | Transportation of Illegal Aliens |

This criminal complaint is based on these facts:

Please see attached affidavit.

☑ Continued on the attached sheet.

_____
Complainant's signature

U.S. Border Patrol Agent, Rosenda Rivera
Printed name and title

Sworn to before me and signed in my presence.

Date: 6/6/25

_____
Judge's signature

City and state: Riverside, CA     Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
Printed name and title

AUSA: Benjmain J. Weir

## AFFIDAVIT

I, Rosenda Rivera, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Joseph Randolph THAMAS ("DEFENDANT") for a violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) (Transportation of Illegal Aliens).

2. This affidavit is also made pursuant to 18 U.S.C. § 3144 and in support of the government's motion for designation of a material witness, identified below, in connection with the criminal complaint sought herein against DEFENDANT for a violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) (Transportation of Illegal Aliens).

3. This affidavit is also made in support of an application for a warrant to search one digital device, a purple iPhone 14 Pro Max (the "SUBJECT DEVICE"), seized from DEFENDANT on June 4, 2025, and currently in the custody of United States Border Patrol ("USBP"), in Indio, California, as described more fully in Attachment A.

4. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I), (a)(1)(B)(i) (Conspiracy to Transport and Harbor Aliens in the United States); 1324(a)(1)(A)(ii), (a)(1)(B)(i) (Transporting Illegal Aliens for Private Financial Gain); and 1324(a)(1)(A)(iii), (a)(1)(B)(i) (Harboring Illegal Aliens for

Private Financial Gain) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

5. I was not involved in the arrest of DEFENDANT, his <u>Mirandized</u> interview, or the interview of the material witness. The facts set forth in this affidavit are based on my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested complaint and search warrant, and that there are sufficient facts to establish that the testimony of the proposed material witness is material in a criminal proceeding, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

6. I am a graduate of the United States Border Patrol Academy and Federal Law Enforcement Training Center. As part of my training, I received criminal investigation training that included course studies in, among other things, criminal law, immigration law, constitutional law, search and seizures, and courtroom procedures.

7. I am currently assigned to the El Centro Border Patrol Sector's Asset Forfeiture Office as a Border Patrol Agent, and I

have been employed since July 28, 2002. I am responsible for investigating, arresting, and facilitating prosecutions of alien smuggling organizations that use the Southern and Central Districts of California as an operational corridor.

8. During the course of my employment with USBP, I have participated in alien smuggling investigations that have resulted in federal criminal charges. In connection with that work, I have made arrests, prepared reports in federal proceedings, and provided sworn statements in federal criminal proceedings. My work also has included speaking with suspects, cooperating witnesses, and other law enforcement personnel regarding the different methods by which the crime of alien smuggling is committed.

9. Through my experience, I have gained a working knowledge and insight into the typical workings of criminal alien smuggling organizations. I also have gained extensive information regarding the normal operational habits of persons who make their living as alien smugglers, including the behavior, speech, routes, and methods of operation of alien smugglers to avoid detection and apprehension by law enforcement officers.

### III. **STATEMENT OF PROBABLE CAUSE**

10. Based on my review of incident reports, conversations with other law enforcement agents, and data contained in Department of Homeland Security databases, I am aware of the following:

### A.  Traffic Stop and Initial Investigation

11. Border Patrol Agent ("BPA") E. Popp is currently employed with the United States Border Patrol in Indio, California. On June 4, 2025, BPA Popp and his Field Training Officer, BPA A. Ascencio, were assigned to roving patrol on Interstate 10 ("I-10"). They were wearing rough-duty Border Patrol uniforms including identifying insignia and a badge. They were operating a marked Border Patrol vehicle equipped with lights and sirens. BPA Ascencio has over 23 years' experience as a BPA and has been involved in apprehending and investigating numerous smuggling events along the I-10 corridor throughout his career. He is familiar with the appearance, behavior, and tactics exhibited by people involved in smuggling contraband. BPA Ascencio spent five years with the Los Angeles High Intensity Drug Trafficking Area Criminal Interdiction Task Force.

12. BPAs Ascencio and Popp were observing westbound traffic on I-10, approximately two miles west of the Cactus City rest stop, looking for indicators of criminal activity. I-10 is the southernmost east-west, coast-to-coast interstate highway in the United States. It stretches from California to Florida. Interstate 8 ("I-8") is the southernmost interstate highway in California that runs parallel to the United States/Mexico border. Based on my training and experience, I know that illicit contraband and people being smuggled across the border will reach the I-8 and be picked up to be further smuggled inside the United States. Unlawful aliens being smuggled are

4

often then taken via the I-10 to avoid Border Patrol Checkpoints.

13. At approximately 4:20 p.m., BPAs Ascencio and Popp observed a blue, four-door Subaru Forester bearing a Florida license plate pass their location heading westbound on I-10 in the number one lane (furthest left). The driver briefly looked in BPAs Ascencio and Popp' direction and continued traveling westbound. The Subaru caught their attention because recently, Indio Border Patrol Station interdicted a gun-smuggling event which also utilized a Subaru. The Subaru then accelerated and immediately moved to the slow lane in front of a semi-tractor trailer.

14. BPA Ascencio searched Department of Homeland Security ("DHS") databases for the license plate on the Subaru. The databases indicated that the Subaru was registered to Rogelia Jimenez-Thamas (DOB: \*/\*/1969) in Penn Valley, Florida. DHS databases showed that DEFENDANT had driven the Subaru into Mexico on June 2, 2025, through the San Ysidro Port of Entry, and that, on June 4, 2025, at approximately 10:00 a.m., DEFENDANT returned to the United States in the Subaru through the Tecate Port of Entry from Mexico.

15. Based on the direction of travel and their location on the I-10, BPAs Ascencio and Popp suspected the Subaru had taken a circuitous route from the Tecate Port of Entry through Arizona. BPAs Ascencio and Popp have been involved in various seizures that have used this route of travel.

16. The most direct route of travel for the Subaru from the Tecate Port of Entry would have been using Highway 86. Records checks showed that the Subaru did not pass through any Border Patrol Checkpoints on June 4, 2025, and there are two operational Border Patrol Checkpoints on Highway 86 and Highway 111 (which would have also been a faster route than going via Arizona). BPAs Ascencio and Popp therefore suspected that the driver was actively involved in illegal activity and had used an extended route of travel to circumvent these two checkpoints. This conclusion is supported by the fact that the drive time from the Tecate Port of Entry to the location where they first saw the Subaru would have been over four hours, and it had been approximately six hours since the Subaru had crossed the border.

17. BPAs Ascencio and Popp drove parallel to the Subaru and saw two males inside the vehicle. At this period of time, the Subaru was driving approximately 65-70 MPH and in the flow of highway traffic. Neither occupant fit the description of the 55-year-old female registered owner. In BPA Ascencio's training and experience, smuggling organizations will purchase a vehicle and register it to a person that will attract less scrutiny if encountered by law enforcement.

18. BPA Popp drove approximately 5 car-lengths in front of the vehicle to allow the Subaru's occupants to see that they were law enforcement. BPA A. Alvarez then drove parallel to the Subaru in an unmarked law enforcement vehicle to observe the occupants' behavior. After BPA Popp and Ascencio passed the Subaru, the Subaru slowed significantly by approximately 20 MPH

and maintained a large gap from BPA Popp and Ascencio. The decrease in speed occurred notwithstanding the fact that the highway was going downhill at that point in time. Once the Subaru hit a speed of approximately 45-50 MPH it maintained that speed.

19. In BPA Popp's training and experience, it appeared that the driver, later identified as DEFENDANT, was trying to distance himself from the agents to prevent them from being able to gain information on the Subaru and its occupants and/or contents. BPAs Ascencio and Popp have witnessed this same reaction, that is, a change in behavior when encountered by law enforcement, in prior smuggling cases.

20. BPA Popp continued driving in front of DEFENDANT for approximately 2 miles before he pulled off to the shoulder and allowed the Subaru to pass. Once DEFENDANT passed their marked unit, BPA Popp merged back on the Interstate and began to follow DEFENDANT. BPAs Ascencio and Popp decided to perform a traffic stop on the vehicle based on their observations and the information obtained from DHS databases.

21. BPA Popp activated his vehicle's emergency equipment and DEFENDANT pulled to the shoulder of I-10 approximately one mile from the Dillon exit. BPA Popp approached the vehicle on the passenger side and used hand signals to the occupants for them to roll the window down. BPA Popp repeated himself numerous times before DEFENDANT rolled down the driver's side window. BPA Ascencio approached DEFENDANT on the driver's side. BPA Alvarez joined BPA Popp at the passenger side window and

asked the passenger to step out of the vehicle. The passenger, identified as Misael MARTINEZ-Hernandez ("MAT-WIT"), stepped out of the vehicle and BPA Alvarez questioned him regarding his immigration status. MAT-WIT stated that he was in the country illegally and was placed under arrest.

22. BPA Popp joined BPA Ascencio as he questioned DEFENDANT away from MAT-WIT. During questioning, DEFENDANT took long pauses before responding to questions and repeated questions multiple times. In BPA Popp's training and experience, DEFENDANT's behavior indicated that he was being evasive and had to make up answers to try not to incriminate himself. After the questioning stopped, BPA Ascencio then spoke to the MAT-WIT. The MAT-WIT and DEFENDANT provided conflicting statements regarding the MAT-WIT's name.

23. MAT-WIT did not have a phone on his person at the time of arrest. The SUBJECT DEVICE was found in the center console of the Subaru within arm's reach of the driver seat. It was the only electronic device that was recovered in the Subaru.

**B.   Video-Recorded Interview of MAT-WIT**

24. During a recorded sworn statement, after being read his Miranda rights, MAT-WIT stated that he is a citizen of Mexico and does not possess immigration documents allowing him to enter or remain in the United States. MAT-WIT stated that he entered the United States illegally through the mountains near Tijuana, Mexico.

25. MAT-WIT was presented a six-pack photo line-up. MAT-WIT identified DEFENDANT as the driver of the Subaru. MAT-WIT

stated that DEFENDANT was going to transport him to Los Angeles, California. Upon arrival, MAT-WIT's friend was going to pay DEFENDANT a $7,000.00 smuggling fee.

26. MAT-WIT stated that his final destination was Bakersfield, California. The most direct route from MAT-WIT claimed entry point to Los Angeles would have taken him through the I-5 Immigration Checkpoint. Other more direct routes of travel would have taken him through the Highway 86 or Highway 111 Immigration Checkpoints. This further indicates that DEFENDANT intended to transport MAT-WIT in a manner to avoid immigration checkpoints.

C. **DEFENDANT's Recorded Interview**

27. DEFENDANT was read his Miranda rights. DEFENDANT stated that he did not want to answer questions without an attorney present.

IV. **TRAINING AND EXPERIENCE ON ALIEN SMUGGLING**

28. Based on my experience and training, I am familiar with the methods employed in smuggling operations and the smuggling patterns employed by such organizations. I have also spoken with other experienced agents and other law enforcement officers about their experiences and the results of their investigations and interviews. I have become familiar with the methods of operation typically used by alien smugglers. Based on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

9

a. Alien smuggling is generally a continuing criminal activity taking place indefinitely unless interrupted by law enforcement action. Indeed, based on my training and experience, individuals who have established an income based on smuggling tend to continue the activity for prolonged periods of time because that is how they make a living.

b. Alien smugglers often use one or more telephones, pagers, or other digital devices, sometimes in fictitious and/or other individuals' names, to communicate with other participants in their smuggling operations, including co-conspirators and customers, regarding matters such as price, arrival time, and meet location. This communication can occur by phone, text, email, or social media. Alien smugglers maintain in such devices telephone and other contact information which reflects names, addresses, and/or telephone numbers of their associates in the alien smuggling organization, as well as customers of the alien smuggling business. Further, alien smugglers will also use text messages to send photographs as codes or actual pictures or videos. I know that the above-described information can be stored on digital devices carried by alien smugglers.

c. In addition, I know that professional smuggling operations depend upon maintaining both long-distance and local contacts with individuals in the source country who arrange the initial payment and embarkation, as well as those in the United States who facilitate arrival and collection of any remaining smuggling fees. Smugglers often use fraudulent

information to subscribe to cellular telephones, maintain separate customer and supplier telephones, and frequently change cellular telephones to thwart law enforcement efforts to intercept their communications. Smugglers frequently use pre-paid telephones and/or false or misleading subscriber information as a way of distancing themselves from criminal liability.

    d. Individuals involved in human smuggling commonly obtain partial payment from customers prior to embarkation and accept the remaining payment upon safe arrival in the United States. Therefore, I am aware that individuals involved in human smuggling maintain books, customer lists, receipts, notes, ledgers, and other records relating to the negotiated price for a customer and any partial payments made or due, and that such documents may be in code to attempt to thwart law enforcement detection.

    e. Smugglers keep records of their illegal activities for a period of time extending beyond the time during which they actually transport a particular customer, in order to maintain contact with criminal associates for future smuggling operations, and to have records of prior transactions for which, for example, they might still be owed payment, or might owe someone else money

    f. Alien smugglers frequently use Global Positioning System ("GPS") devices to navigate. I know that GPS devices often store route history information of previously travelled routes.

    g. Data contained on digital devices used by smugglers often include, among other things, records of telephone calls, text messages, e-mail and social media communications between the smugglers and the co-conspirators; Global Positioning System ("GPS") information and other location information that can help identify embarkation and landing locations, meeting places, and smuggling routes; and identifying information about the smuggler and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

### V. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

29. As used herein, the term "digital device" includes the SUBJECT DEVICE.

30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

31. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

32. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

14

fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

        b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    33.    The person who was in possession of a device or had the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress DEFENDANT's thumb- and/or fingers on the SUBJECT DEVICE; and (2) hold the SUBJECT DEVICE in front of DEFENDANT face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

    34.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

## VI. CONCLUSION

35. For all the reasons described above, there is probable cause to believe that DEFENDANT has committed a violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (Transportation of Illegal Aliens).

36. Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on the SUBJECT DEVICE as described above and in Attachment A.

37. Finally, for all the reasons described above, there is sufficient facts to establish that the testimony of MAT-WIT MARTINEZ is material in a criminal proceeding, and that MAT-WIT MARTINEZ should be designated and detained as material witness pursuant to 18 U.S.C. § 3144 (release or detention of a material witness).

_____
ROSENDA RIVERA
U.S. Border Patrol Agent

Subscribed to and sworn before me this 6th day of June, 2025.

_____
HON. SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE